**COOK, Appellant, v. WILLIAMS et, Appellees.**

Ohio Appeals, First District, Hamilton County.

No. 7528.    Decided March 17, 1952.

Chester K. Gillespie, Cleveland, William N. Lovelace, for appellant.

Berry, McClain & White, for appellee, Percy Williams.

## OPINION

By MATTHEWS, J.:

The notice of appeal recites that the appeal is on both law and fact, but as no appeal bond was filed, the appeal has been reduced to law only. A bill of exceptions has been duly filed and the appeal now comes on for hearing upon a complete record of the proceedings in the trial court. The trial court rendered judgment for the defendants. It is claimed by the plaintiff that error intervened.

The plaintiff is the only child of Cora L. Williams, deceased. The defendant, Percy Williams, is her widower. They were her only heirs and next of kin. The other defendants were joined as parties because they have or claim an interest in the subject-matter of the action.

The prayer of the petition is to have a certain deed conveying certain described real estate from Cora L. Williams to Percy Williams and a transfer of certain corporate stock in Play Bowl, Inc., set aside, and for other relief incident to the setting aside of those transfers. The basis for the relief sought as alleged in the petition is that Cora L. Williams on July 5th, 1950, when these purported transfers were made, was mentally incapable of transacting any kind of business and particularly mentally incapable of understanding the nature and effect of this deed to the real estate and this transfer of the corporate stock, and that she was induced to execute said instrument of transfer against her will through the undue influence, fraud, and deceit of her husband, Percy Williams.

Neither the plaintiff, who is the daughter of Cora L. Williams, nor the defendant, Percy Williams, who is her widower, testified in this case. However, the evidence shows that for some months prior to the execution of these transfers, Cora L. Williams was suffering from hardening of the arteries of the kidneys, causing high blood pressure and excitation of her mind and feelings, and that she had been hospitalized from May 20th to June 17th, 1950, but had been returned to her home on the latter date, where she remained until July 6th, when she was returned to the hospital, where she remained until her death there on July 9th, 1950. While, perhaps, her condition varied from day to day. her general condition deteriorated, so that on July 6th, her physician directed that she be returned to the hospital not for curative purposes, but in order that her remaining days might be made as comfortable as possible. There is no doubt whatever that on July 5th, 1950, Cora L. Williams was very sick and was, perhaps, physically incapable of writing her name. At any

rate, her hand was guided by one of the witnesses when she signed the deed, which the plaintiff seeks to have set aside.

The defendant, Percy Williams admits that Cora L. Williams was very sick on July 5th, and that in retrospect, it could be said that she was dying. Nothwithstanding this, he asserts that her act in making these transfers was the result of her own judgment and decision, freely made, with full knowledge and understanding of all the facts. In proof of his position, he produced five witnesses, apparently disinterested, who testified to various transactions with, and observations of her during this period, indicating that she participated in business transactions and responded intelligently, and they expressed the opinion that she understood the nature and effect of the transfers, and that they carried out her intention. Their testimony, if believed, proved that she arranged for these transfers, and that neither Percy Williams nor any one else suggested that she should do so. Some of these witnesses testified that Cora L. Williams was asked more than once whether she wanted her daughter, the plaintiff, sent for, and she said she did not. While Percy Williams was in the room when the deed was executed, there is no evidence that he took any part in the transaction, and that her purpose was to transfer back to him the property which he had theretofore conveyed to her.

One of the grounds, and, perhaps, the principal ground, urged for the reversal of this judgment is that it is manifestly against the weight of the evidence. It is clear that in view of this array of witnesses testifying that Cora L. Williams was of sound mind and that the transfers were her voluntary act, free of any deceit or fraud, this Court would not be justified in disturbing the conclusion of the trial court on the ground that it is against the manifest weight of the evidence.

The plaintiff placed four witnesses upon the stand. The first was the attending physician. He testified that Cora L. Williams was very sick with the fatal malady already described. He saw her on July 3rd, and again on July 6th. The most that can be gleaned from her testimony is that she was very sick on both dates, but more critically so on the latter date, and that perhaps on the latter date she was somewhat confused. On both occasions, she was incapable of much physical exertion. He would not say she was mentally incompetent on July 5th. His testimony does not go beyond the admitted fact that she was very sick and suffering from an incurable disease.

The plaintiff placed two other witnesses—Gillespie and

Jones—on the stand. These witnesses had known Cora L. Williams for about six months, during which they had resided in the same building and had seen her frequently. Each testified that she was very sick, but neither testified that she was of unsound mind.

The only other witness for the plaintiff was Beatrice Kennedy, who had known Cora L. Willaims since 1944, had traveled with her some, and during the intervening years had visited her in her home. The witness lived in Knoxville, Tennessee. While Mrs. Williams was in the hospital, Mrs. Kennedy visited her there on June 11th. The next time she saw her was late on July 5th, perhaps between five and six o'clock, P. M. Mrs. Kennedy came from her home in Knoxville on that date. We are of the opinion that a fair analysis of her testimony could lead to the conclusion that Cora L. Williams was mentally incompetent a few hours after this deed was executed, although in parts of her testimony she testified to conversations and acts indicating rationality.

This was all the evidence introduced by the plaintiff. It certainly cannot be said as a matter of law to outweigh the evidence tending to prove that Mrs. Williams was of sound mind and free from restraint or deception.

The second assignment of error is that the Court refused to allow Mrs. Kennedy to give her opinion as to Mrs. Williams' mental condition. The record shows that she was permitted to testify fully as to the symptoms indicating mental condition. The question that confronts us is whether under the circumstances, the court's rulings, taken as a whole, were so prejudicial as to require a reversal of this judgment. Let us analyze the witness' testimony to determine this question.

Mrs. Kennedy testified that she stayed at the Williams' home during the night of July 5th-6th, that she and Mrs. Berry had to keep Mrs. Williams in bed, that when they returned to the room on one occasion they found Mrs. Williams had gotten out of bed and was in a semi-sitting position on the floor and had soiled her bed. This would seem to indicate that she had tried to reach the bathroom, and would indicate physical, rather than mental weakness; that later they assisted Mrs. Williams to make a useless trip to the bathroom at her request, "she couldn't walk very well," that between June 11th and July 5th, she had telephoned to the Williams' residence, but did not talk to Mrs. Williams; that medicine was administered to Mrs. Williams during the night of July 5th-6th, that Mrs. Williams was quite restless and complained of pain in her head during that night; that she had not had much experience in observing the mental condi-

tion of people, that some things Mrs. Williams said "I couldn't understand them very well and what she said was said incoherently if that is any indication of her mental condition." Thereupon, the witness was asked this question: "In your opinion when you arrived there on July 5th, was she rational or irrational?" The Court sustained an objection to this question. The plaintiff excepted to the ruling, but made no profert.

All the foregoing testimony was developed on direct examination. It was also developed that Mrs. Williams asked Mrs. Kennedy for a glass of water and that her hand trembled so much that Mrs. Kennedy steadied her hand while she drank a small amount.

On cross-examination, Mrs. Kennedy testified when she arrived at the Williams home late on July 5th, Mrs. Williams recognized and talked to her, that Mrs. Williams had false teeth, but that she did not have them in her mouth at the time she was talking to her, that she asked Mrs. Williams if she wanted her daughter—the plaintiff—notified, and she answered that she did not, and that she refused to change her mind about it, although Mrs. Kennedy urged her to do so, that on the night of July 5th-6th, she read from the Bible to Mrs. Williams.

Although Mrs. Kennedy's testimony discloses that Mrs. Williams was physically very sick and weak on July 5th, there is very little indication of mental disorder other than that naturally resulting from physical weakness. She conversed with Mrs. Kennedy, seemed to have positive views and answered responsively when asked whether she wanted her daughter notified. The strongest statement indicating mental condition is that she could not understand Mrs. Williams very well and what she said was incoherent. Her inability to understand Mrs. Williams perhaps resulted from the absence of teeth. Her statement that what Mrs. Williams said was incoherent was not elaborated upon, and there are varying degrees of incoherency or inconsistency. There certainly is as much in Mrs. Kennedy's testimony indicating mental capacity as otherwise. We say this because we doubt very much whether a sufficient foundation was laid for the expression of an opinion by the witness. The witness herself seems to have doubted her qualifications to express an opinion on the decedent's mental condition. However, we are not called upon to determine whether a proper foundation was laid.

As already noted, the plaintiff made no profert of the expected answer. The law is well settled that in the absence of a profert, a reviewing court is in no position to deter-

mine whether the error, if any, is prejudicial. In **2 O. Jur., (Pt. 1) page 339 (Sec. 169)** it is said that:

"Furthermore, where evidence offered in chief is excluded, the party offering it must show what he expects to prove by the witness in order to enable the reviewing court to see if there has been error on account of the refusal of the court to receive the evidence." See, also, **Pace v. Buck, 86 Oh Ap, 25.** It certainly is not at all clear how this witness would have answered this question. We would not be justified in assuming that the answer would have tended to prove the plaintiff's allegations, especially in the absence of such a profert. We, therefore, hold that no prejudicial error appears on the record in this regard.

The plaintiff offered no expert opinion evidence in chief and the defendants offered none in defense. In rebuttal, the plaintiff placed upon the stand a psychiatrist, who testified that he had seen and studied the hospital records relating to Mrs. Williams and had an opinion as to her physical and mental condition. The court sustained an objection to the question as to his opinion of her mental condition, and counsel proferred that, if permitted to answer, the witness would have said that on July 5th Mrs. Williams was totally confused mentally and wholly incapable of transacting any business. The reason given by the Court for sustaining the objection was that the plaintiff should have offered this evidence in chief rather than in rebuttal. This ruling of the court is the last assignment of error.

Both by statute (§11420-2 GC) and at common law orderly trial procedure requires that a plaintiff shall produce in chief all the evidence in support of the issues upon which he has the burden of proof, unless the Court for good reasons, in furtherance of justice, allows him to re-open his case. **39 O. Jur., 594, 644 and 645.** In other words, the trial judge is vested with discretion and his exercise of that discretion cannot be disturbed by a reviewing court in the absence of a manifest abuse of his power. In this case, the plaintiff rested her case in chief without mentioning an intention to offer this expert's opinion, and without asking the Court to permit its introduction out of order, and the defendants introduced their evidence and rested their defense on the assumption that the plaintiff would be confined to rebuttal evidence. This Court cannot say that the court abused its discretion in refusing to permit her to re-open her case in chief for the purpose of offering this expert testimony.

For the reasons given, the judgment is affirmed.

HILDEBRANT, PJ, MATTHEWS & ROSS, JJ, concur.